May I please the Court, Terry Gross, for appellant? I'd like to reserve five minutes for rebuttal. The sole issue before the Court below was whether the identified payment obligations of the Congo were used for commercial activity in the United States within the meaning of the Foreign Sovereign Immunities Act. But the District Court should not have even reached this issue. That's because the Congo, in order to induce a loan, agreed in the loan agreement underlying the judgment that it, quote, consented to execution and enforcement against any property whatsoever irrespective of its use or intended use. And further, that it not only agreed to waive sovereign immunity, but also that it agreed not to claim any such sovereign immunity. All right. So this leads to two questions. One is the elephant in the room, which is the res judicata problems or issues. And the second, if we get over that, is what this, you know, strange statute means, which does seem to limit the instances in which it only operates when there's a waiver. So the question is, can you waive the provision that deals with waivers, which is a complicated question. But let's deal with the res judicata questions first. Okay. With respect to res judicata, I mean, obviously the District Court didn't reach this issue, saying it was bound by collateral estoppel. But this was an error. It said it was that collateral estoppel applied because the nonassertion of immunity claim had been litigated before the Fifth Circuit, citing pages 248 to 51 of the CBC opinion. However, a review of that opinion at those pages or at any other pages demonstrates that the Fifth Circuit never addressed the nonassertion of immunity claim. Pages 248 to 51 are on an entirely different topic about whether an order of the New York court gave CBC permission to execute against property of the Congo, not the issue of nonassertion of immunity. And in fact, as Appellant demonstrated the other day, the Congress of New York There are at least three different res judicata or preclusion questions here, as I understand it. This is one of them. And then there's the basic, what does use for mean? And the third is, I noticed that the more recent opinion in the Fifth Circuit actually also decides the instrumentality question with regard to the alter ego entity. So there seem to be three of them. And I gather you'd give us different answers with regard to the three of them, is that what you're saying? That the first one just wasn't decided? I mean, for each of them, you have to look at whether the issue was raised, actually litigated. All right. Two and three were certainly raised and decided. You're saying one wasn't. One clearly was not. Okay. So you're saying that the Texas, the Fifth Circuit did not decide whether or not the Congo waived its immunity under the loan agreement. Is that? No, no. It's Which one? The issue of, the issue that under the loan agreement, the Congo agreed not to assert immunity. Not to assert. Which is broader than just waiving immunity. Okay. Agreed not to assert immunity. That if you look, I mean, if you look at the first CBC opinion, that issue was not raised. Why is that a different question? Than the Why is that a different issue? Because one can, one can not, one can agree to waive immunity, which, for example, that can happen implicitly by appearing in a court and not asserting it. Okay. But we have something that's even further, that in this, that in this agreement, the language here, they, the Congo agreed that it would not even claim sovereign immunity. And I think if we You're saying that the Fifth Circuit did not address the non-assertion language. Is that what you're saying? That's correct. And we submitted it with a request for judicial notice, the briefs that CBC had actually submitted to the Fifth Circuit in that case. So that argument is persuasive only if we say that's two different waivers, if you will, one non-assertion and one waiver. I don't necessarily see the distinction between those, because if you've waived your right, then that's, that implies that you're not going to assert it, because if you can assert it, you haven't waived it. Well, what, what, for example, the implicit waiver that I, that I talked about, which is where the Congo or some sovereign comes into court and then doesn't assert it, there's numerous case law that says, well, they can waive it. And that's Even if later, even if late, even if it's an unknowing waiver and later they say, oh, excuse me, I really, we really did have sovereign immunity, we want to waive it, the courts have held one that they're out of luck, that they needed to raise it initially. Yeah. Non-assertion equals waiver. And, well, okay. But here we have a contractual undertaking where they said we are, we agree we're not going to assert it. I don't see a difference. Well, if you look at virtually all of the cases that talk about waiver of immunity, where they quote the language, it's different than the language that's in this loan agreement. But the effect is the same. That's, I guess that's why I'm having difficulty. I think you're trying to parse something that really is the same. That's, I'm having a difficulty with your distinction you're trying to make between waiver and non-assertion. Well, I guess where it comes down to is why is there different language in this loan agreement than there are in virtually all of the other cases that deal with a waiver issue where they quote whatever the language is in those contracts. My understanding, I happen to have looked at this question for another case in this calendar which, interestingly enough, raises a similar distinction. And my understanding of, I think it's the restatement or maybe it's Blackstone, but at any event of the history of this concept, is that the non-assertion is narrower, not broader. In other words, if you waive, well, maybe not. That waiver is a waiver of the right. That non-assertion essentially is a recognition that even if you have the right, you won't assert it. So if they've waived the right, what are they going to assert? In other words, if your position seems to be they've waived, that they have, that because of the statute, any substantive waiver essentially doesn't fly unless it comes within the terms of the statute. So if the substantive waiver doesn't fly, then how does the non-assertion trump it? How can you not assert something you don't have, essentially? Well, I mean, I think really what the question is, why is there this additional language there? And it must have some meaning. I mean, there's the general rules of construction of contracts, which basically says you try to give meaning to every phrase. I think it's possible to assert it even if you have it. In other words, it would be an agreement to not assert it, even in instances in which possibly, in the statute, it would allow you to. Well, let's look at the language. But it doesn't work the other way. Do you see what I'm saying? You're trying to use the other language. I can see, perhaps, if you just had that language just by itself. But here, if you look at this entire provision, this is paragraph 19C and D of the loan agreement, if you look at the entire provision, it shows what the intent is, that basically it also says that they agreed to execution as to any property, irrespective of its use or intended use, and further, that this was intended to be construed under the embassy. So therefore, it would have to apply to the embassy, right? If you wanted to go and attach to the embassy, you could do that. No, Your Honor, because as Your Honor has pointed out in Moore v. United Kingdom, that there's treaties that protect embassy property. But aside from that, you can come up with other examples of property that clearly would not meet the statutory standard and would be sort of sovereign property, maybe not the embassy, but the car that they're driving or something. Well, what the purpose, I mean, you know, what the purpose of the FSIA in grafting this barrier to execution on sovereign property is really to protect, to avoid execution on property that could create diplomatic problems between the United States and the sovereign. Well, it does seem to be a real policy issue. I mean, here you're going after a U.S. oil company that, you know, basically pays the Congo for oil purchases. And, you know, I'm having a hard time seeing how those payments are used for commercial purpose in the United States, because then every other United States business that does something, I mean, the Congo borrowed the money, and I was surprised that you could build a highway for $6 million or whatever. I don't, that's, some people build houses for that. But the, but, you know, AFCAP is how far removed from that initially, or is it about the third person that bought the note? Yes, it is. But that's, you know, with, you know, all loans, that there is a secondary market for those loans. That's what gives the loans value. With, you know, all of our mortgages on our houses, they often get sold many times, and that doesn't mean that they should not be enforced. Well, the use for commercial purpose in the United States, though, it would seem to me if we adopted your, what you want us to adopt, and not what the Fifth Circuit is saying, is that, you know, every company, the United States company that's doing business on, you know, on foreign soil, that they're going to be subject to attachments. If there's commercial activity that's taking place in the United, if there's property in the United States, with respect to commercial activity in the United States, then, yes, debts that are owed by the U.S. companies to the foreign sovereign should be attachable and executable. Could you address specifically on the assumption for the moment that the Fifth Circuit standard applies, which we can talk about later, the prepayment transaction in particular? I mean, that seems to me to be the most questionable and the one that under the more recent Fifth Circuit case may well, even under the Fifth Circuit standard, be a use in the United States. Okay. Well, in that case, the Congo was owed several multimillion-dollar bonus obligations, okay, by COCL. Okay. But they were owed. Well, it then pledged these bonus obligations as collateral several times for the procedural posture of this case. That was as collateral in the $25 million loan in the pre-financing agreements, as collateral in the $5 million prepaid oil sales contract. And both of these agreements, besides being with a company that must be presumed to be a U.S. corporation, they are under U.S. agreements or under U.S. law, and they're with payments, require payment to U.S. bank account. In addition to show that the Congo is – has a history of pledging these types of – these exact royalties and these types of royalties – I'm sorry, these types of bonus payments as collateral in the original loan agreement, it pledged these same transactions as collateral. And did the district court – I mean, I gather there's some dispute about whether these were really loans or not, but the district court characterized them as loans, did it? Well, the – yeah, the district court characterized them as loans, and the Congo's declarants characterized them as loans, even though the Congo in its brief now said they weren't loans. But irrespective of whether they're loans or not, they were pledged as collateral in a transaction with a U.S. corporation. And that should be sufficient under the Fifth Circuit standard. Now, the – the district court did not have the benefit of the Fifth Circuit's second opinion. That is correct. And so therefore, the Fifth Circuit also relied on and followed the district court opinion in finding that past use wasn't sufficient to – to consider for whether it was used for commercial activity in the United States. So, Counselor, just so I understand your argument, you're saying that if the obligations were pledged as security for the loan, they're used in commercial activity? Is that – is that your argument? If the – yes. Well, if the – if they were pledged as security for a loan for a U.S. corporation, yes, because the U.S. corporation is present here. And the U.S. corporation being what entity? COCL, which under the presumptions that must be applied in this case, it must be considered a U.S. corporation or the alter ego of Chevron Texaco. So your argument is COCL made a loan to the Congo. Is that your argument? Yes. Okay. And what was the loan that COCL made to the Congo? Well, there were two agreements. There was a $25 million prepaid oil sales contract, which we – Well, but isn't prepayment for oil, isn't that different than a loan? I mean, isn't that what they argued? Well, the Congo in its declarations called them – called it a loan, okay, that if you look at the agreement and you look at what the nature of what it is, it's a loan. There's a – there's an interest. There's a 1 percent discount per month to serve – And there's also a possibility of paying it back with money as opposed to oil. Yes, that's correct. And it's not even paying it back – it's not about paying it back with oil. They sell the oil and you pay it back with the proceeds from the oil. So it's not really being paid back in oil. It's being paid back in money. And even if it wasn't a loan, it is still a commercial transaction in which the bonus obligations were pledged as security. Do you want to reserve your time? You have exactly 5 minutes. Yes, I do. Thank you. May it please the Court. I'm Neil Popovich representing the Republic of Congo, a foreign sovereign nation. I would like to split a portion of my time with Mr. Boven, who is representing the Chevron-Texaco entities. Well, since we're on that $25 million payment, if it's really prepayment, then why does the Congo have to pay it back? If it's prepayment for oil, why do they have to pay it back? They don't have to pay it back. It's paid back by COCL to itself by the revenues that COCL – the oil that COCL takes. It's a payment. The mechanics of the payment is there's a prepayment to the Congo. The Congo doesn't have to pay money back. COCL, rather than paying something to the Congo, pays it to itself. But as the Congo up front pays the Congo its portion, its estimated portion of the oil proceeds up front and then pays itself back the money that would have gone to the Congo in due course after the oil proceeds are generated. That's a credit against the prepayment. I would like to clarify one matter, though, and that is the status of COCL. Mr. Gross has made reference to it being a presumed U.S. company. That is not the presumption that was made in the district court. The presumptions – there were several presumptions that were the predicate for the dispositive motions. One was that SNPC would be presumed to be the alter ego of the Congo. With respect to the Chevron Texaco entities, the only presumption was that they were present in the United States for purposes of personal jurisdiction, so that the court deferred ruling on those entities' motion to dismiss. Would you say it's a presumption, or you say more like a stipulated – it was stipulated? Assuming for purposes of arbitration, so that we could frame a dispositive motion for Judge Hamilton. People agreed that. I mean, it's more like a stipulation than – Well, it's a stipulation for the limited purpose. In other words, if the – and indeed, Judge Hamilton specifically held the motion to dismiss in abeyance. Had she ruled differently on the dispositive motions, then the motion to dismiss that COCL and others had filed would have been ripe for decision. Quite specifically, what was stipulated, assumed, or whatever, was that it was property in the United States. Is that what it was? No. That the Chevron Texaco overseas entities that were defendants in the – not the original Garnison Act. The consequence of that for current purposes is that the property, for purposes of this motion, was assumed to be property in the United States. I understand it's an open question. If we were to – That was debated by the Congo, but Judge Hamilton decided it as if that further presumption that Your Honor has described was made. Right. The assumption being that if they're in the United – if the company is in the United States, then their obligations are in the United States. That is correct. So we – the decision below, Judge Hamilton did not make a ruling on the situs determination. But assumed it for purposes of making this ruling. So that's where we are. That is correct. And that's the assumption that we have to accept to rule on this appeal. Right? You can't accept it. I think there is sufficient evidence in the record that the court – that this Court were inclined to could make its own determination on the situs issue. But the focus of Judge Hamilton's decision was assume situs and then determine are the obligations, that is, the property at issue. Well, certainly in a situation in which discovery was sort of directed at one issue would be really quite inappropriate for us to do anything else. I mean, there was – the whole case, as I understand it, was set up this way. And if we were to go behind it, we would have to worry about whether there was – whether the discovery was truncated in order to go – to decide only this issue and nothing else. The court would need to assess that. I think if the court got to that point, there was, in fact, adequate discovery. But I do not think that this Court needs to assess that issue. So you're not asking us to do this. All right. So let's not talk about it. Let's assume what everybody else has been assuming. Okay? Now, with respect to the waiver issue, the structure of the statute is such that you're – Before we go to that issue, how about the commercial – the commercial use issue that opposing counsel talked about regarding this payment? The free payment is contractually pre-committed so that it is gone. It has been, in effect, transferred to COCL. But it was in the middle of the litigation, wasn't it? It's – Yes or no?  Yes. Okay. It was in the middle of litigation. All right. So it's not terribly attractive for us to say that because some transaction was concocted in the middle of litigation, possibly to avoid this very problem, that we should ignore the situation as if it were in the past. It was in the past. Now it's in the past, but it wasn't in the past at the time litigation began. But if the – if there is no impediment to that transaction occurring – Well, that's a different question. But the fact that it was in the past doesn't sound very – that it's now happened doesn't sound very useful. Well, but it raises a distinction between the obligations at issue in the Fifth Amendment and the prepayment obligation. The prepayment obligation is the same stream of obligations. In contrast, the prepayment, once it's done, it's done. The other – the bonus – I'm sorry. Once the bonus is paid, it's paid. And it's – the question is what is – But isn't there a provision here that allows for the prepayment obligation to be decreased if the bonuses are paid in the meanwhile, indicating that the prepayment obligation isn't – doesn't feel very much like an actual payment for oil because it seems to be being – first of all, it's not really to be paid back in oil, as I understand it, and also the obligation will be diminished by money, not by oil. The issue – the obligation that we're trying to assess its commercial use by the Congo is not the prepayment, it's the bonus. And so the question is – I understand that. But the real – but the question is whether the prepayment is really a prepayment for oil or whether it is, as I understand the district court characterized it, a loan. Because if it's a loan, the – the past and future aspect of it, seems a lot less relevant. What you have is a collateral for a loan, which has to be paid back in money if it isn't paid back through the bonus. But I think that's backwards. I think the way this was structured in the contractual language will support this is that first you look to the bonus. In other words, it's not if the prepayment isn't otherwise paid, then you look to the bonus. The bonus is stated as the fund of money that will be used to repay the prepayment. If, on the other hand, the prepayment has otherwise been exhausted before the bonus is paid, then the money is paid not into the U.S. bank account, but to the Congo in the Congo. But it's a very strange form of buying oil to have it be paid back, not with oil, but by the bonus. Right? In other words, if you really wanted – if you were paying for oil, presumably what you would get for it is oil. But that's not the way this is set up. That, I think, is a peculiarity of these oil agreements. And if you look at the other oil agreements that are at issue here, in many cases they allow royalty payments either in oil or in money. And I don't think that that distinction – But this doesn't purport to be a royalty payment. It purports to be payment for oil, prepayment of oil to be delivered in the future. But it can be paid – instead, you can get money for it instead of oil. It can be paid back with money or with oil. Right. Exactly. Maybe I'm misunderstanding. But let's go to some of the other issues. Okay? Thank you, Your Honor. With respect to the waiver issue, the structure of the Foreign Sovereign Immunities Act makes very clear that, first of all, there's no distinction between not asserting a waiver, which, by the way, that issue was raised in the CBC case in the Fifth Circuit. But there is no distinction between agreeing not to assert it and waiving the defense. With respect to what it takes to waive the defense, the structure of the Foreign Sovereign Immunities Act makes very clear that the only exception to getting to waiver is that you are dealing with property of the foreign sovereign that is in the United States, used for commercial activity in the United States. That's what Section 1610 starts with. The chapeau, as it were, is that it only applies to property used for commercial activity. Another exception is that the property was used for commercial activity upon which the claim is based. That's not this case. In contrast, if you look at Section 1605, which deals with exceptions to jurisdictional immunity, waiver in and of itself is enough. There's no prerequisite that you're talking about a certain type of property. Waiver is an independent exception to jurisdictional immunity. It is not an independent exception to execution immunity. It only comes into play if you have identified potentially attachable property. That the contract may use what sounds like extreme language does not change what the Foreign Sovereign Immunities Act says, nor does it change the fact that there is an unbroken stream of authority from the Supreme Court, the Fifth Circuit, other courts of appeal throughout this country that say it is always a prerequisite to immunity under 1610 that you are talking about property in the United States used for commercial activity in the United States. So you can't skip that analysis. All right. Let's go back to the Fifth Circuit meaning of the language. And I understand that you believe that we are precluded from addressing the issue on its merits. I believe that it that res judicata is appropriate under these circumstances because the precise issue, in other words, whether under the loan agreement, same loan agreement in Fifth Circuit as it was here, whether the loan agreement constitutes a waiver that gets you outside of the used for commercial activity exception and also what used for commercial activity means. And the second is a purely legal question. And I understand that there are circumstances in which preclusion applies to purely legal questions. But I think courts are somewhat reluctant to do that. So my question is what are the particular circumstances here? I mean, I think both litigants would be unhappy with preclusion on strictly legal questions and over their lifetimes probably take opposing positions on strictly legal questions. So why in this instance should we, instead of deciding the issue for ourself and leaving a big gap in the Ninth Circuit on this issue, simply say the Fifth Circuit's decided it? I think that the issue was fully and fairly addressed by parties with the same interests as the parties at stake here. But what about the Chevron-Texaco? They weren't a party to the Texas action. That is correct. But I think that they would support the interpretation that the Fifth Circuit gave. That's not the test. The test is whether they have privity in terms of whether or not it's race judicata. They have no privity at all. And that issue was not addressed as to them. So couldn't we address the issue as to them? And then if our position is not consistent with the Fifth Circuit, then we're not bound by the Fifth Circuit ruling? Had they raised it, I think that would be something for the Court to consider. But skipping beyond that, I think that there is the Chevron-Texaco has not objected to the application. They would object if the result had come out differently. So, you know, so if we're talking about whether it's been decided, if you want to apply these principles, I don't think whether the principles apply have anything to do with whether you win or lose. I mean, that's the parties' decision. They argue it if they like the result or not. But for us, it doesn't matter. I would agree with that, Your Honor. And I also think that this Court can and it would be appropriate for this Court to pronounce upon its own interpretation of the use of a requirement. So let me ask you a question about that, because this is one of the things that I've noticed staring at this thing. Where does this statute say that the use for a commercial activity in the United States has to be a use by the foreign state? That is implicit in – it doesn't explicitly say that. The structure of the language, though, I think as a matter of syntax, that's the way to read it. And I think that there is no case now that suggests that somebody else – Well, actually, the syntax has a very deliberate use of the passive voice, and it appears to me. And what troubles me is that that syntax seems to – gives me substantial pause with the Fifth Circuit's conclusion about the order of things. In other words, it's assuming that the fact that a – that the United States company used it for a commercial activity in the United States is not relevant, and I'm just not sure why that's true. Because it is the foreign sovereign's conduct – we're talking about the foreign sovereign's property, and it is the foreign sovereign engaging in commercial activity that is the premise, the predicate for not providing sovereign immunity. And it would be inconsistent with the purpose of the Foreign Sovereign Immunities Act that a third party, the conduct of the third party, could subject the foreign sovereign to a waiver. We're talking about the foreign – it is the foreign sovereign's engaging in commercial activity or the foreign sovereign's use of its property for commercial activity that triggers an exception to immunity. And to shift that to what some – the conduct of another party doesn't make sense because we're talking about the – it's only the Congo's property, the foreign sovereign's property. That is at risk. That is at risk. It's not the third party commercial actor that the foreign sovereign has a relationship. It's not that entity. Well, I'm trying to think of what a hypothetical would be. But, I mean, suppose the Congo owned an airplane and leased it to Chevron-Texaco to fly around for commercial reasons. What about that? It would be used for commercial activity in the United States, would be the property of the foreign state. Why wouldn't there be an intention to reach that because it's being used for commercial activity in the United States? Well, it's the lease – the leasing of it to Chevron-Texaco for that purpose is the commercial activity that the Congo engaged in. That would be the basis. Probably a bad hypothetical for that reason. Yeah. The problem – the problem here I think you're trying to articulate is that if you read this as applying any time the third party has commercial activity, then virtually nothing is eliminated from – from reach under the FSIA. That and that that would then undermine the – what I understand as the pivot point as a policy decision by Congress, that it is a foreign sovereign's availing itself of commercial activity in the United States that triggers the waiver. But under the Fifth Circuit's theory, the availing itself isn't enough. That's what's strange about it. The fact that they profited by commercial activity in the United States isn't sufficient and instead they have to be using the property prospectively, as I understand it. It isn't where it came from. It's what they're using it for. And the fact that it came from commercial activity in the United States is not sufficient and that's really what I'm questioning, whether the language supports that. I think the language does. The language does. But the language is not limited temporally in terms of only is it using it going forward. What the Fifth Circuit's second opinion says is that you look at the history of its use in the past, the present, and the future. If there was an isolated, aberrational commercial use, that's not enough. If there has been continuing, extended, and monetarily significant use, that is enough, even if that was only in the past. I fear that I'm using up Sheldon Texaco's time as well. Well, thank you. Thank you. We'll give you about six or seven minutes. Thank you. It's always a problem when we have two counsel. Why don't we take a brief break and we'll come back and we'll hear you. Thank you very much. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I hope you enjoyed your rest period and got your thoughts together. The Supreme Court used to break for lunch, and it was really a great time to go up to the library and figure out what you had to say. Go ahead. May it please the Court, Doug Boven, appearing on behalf of the chauvinist entities to this appeal. I'd like to quickly note that there was an argument that the Congo had waived immunity by not raising it at the outset of this case. This case started in the superior court. We were the parties before that court because we were garnished. In response to our garnishment, we raised a whole bunch of defenses, including the Foreign Sovereign Immunity Act, and there's case law that says a third party can raise that. And, indeed, the court is required on its own to consider the application of that defense. There's a rash of these cases out here, Your Honor, across the country, and they are, indeed, putting the ability of American companies to operate in foreign countries through their foreign subsidiaries at great risk. This case started... These cases being what? I mean, what's the common characteristic? These cases where vulture investors are buying these debts at great discounts and litigating extensively around the country to try to satisfy these judgments against American companies here in the United States. And there's a difference between the Texas case where you're talking about a domestic garnishee. In these cases, these years of discovery and why we entered into this stipulation to resolve this case, it's a huge, expensive, costly, disruptive discovery battle. I can't... At least my view is that for current purposes, it's not useful to start questioning whether we're dealing with domestic garnishees. I understand the assumption for present purposes is that we're dealing with a domestic garnishee. My point was the garnishment was of Chevron Texaco Corporation, the parent, and Chevron Texaco Overseas Petroleum, Inc. We had no obligations whatsoever. No, I'm sorry? They have no obligations whatsoever to the Congo. I understand. That should have been the end of the case. But it wasn't, and it isn't the issue before us. Am I wrong about that? That's correct. Okay. So it's not useful. Why do you call them vulture companies? Because they're buying these debts at pennies on the dollar. It's not illegal, though. It's not illegal. I mean, some people might call companies vultures. It has to do with the ability of the sovereigns to reorganize their debt, and they are in the process of doing that. You might want to be careful about characterizing your opponents in that way. That doesn't help me. So let's go back to the bonus, the so-called signature bonus, under the 14K AMI participation agreement where the Congo and Angola are getting together to try to develop oil on their common border. Under the $25 million prepaid crude oil sales contract, this overseas entity sought to acquire the right to acquire two cargos of oil. On the possibility that they wouldn't be able to acquire those cargos of oil, they wanted backup ability to recover the money that they paid for that cargo. And so they chose to have the Congo was given the right to pay the money back, if they so choose. The Congo could have taken the cargo of oil and paid back in money. Or, as turned out here, we didn't get the cargo of oil. It wasn't paid. The signature bonus had been previously committed to us under the terms of that agreement. So this is a one-time. Why isn't that a commercial use? It's not a commercial use. In the United States, of the bonus, because it was used, as I understand it, to secure this prepayment, two prepayment contracts, however one characterizes them. We characterize that as our property. It was our property. It was pre-committed to us. And it wasn't used. What was pre-committed to you? I'm sorry. The bonus under the. It wasn't. It was contingently committed to you. I'm sorry? It was contingently committed to you. It wasn't pre-committed. It was contingently committed, right? The bonus. No, we had the right to take it. Nothing further had to be done. If we weren't paid by a certain. If you weren't paid, so it was contingent. Or if we didn't have a cargo. Right. So it was contingent. Well, I think it was pre-committed to us. And we didn't have to do anything further to do it. You didn't have to. We paid it to ourselves. I know. But did you have to not get the material? Did you have to not get. Did something have to happen before you had a right to pay it to yourself? No, Your Honor. Nothing had to happen. But it was our property. It was assigned to us, committed to us under the terms of the agreement. If you had gotten the oil, you couldn't. If you had gotten the oil, that would have taken care of it, right? If we had taken a cargo of oil, yes. That wasn't offered to us. We didn't get it. I'm really kind of confused. I thought that. Did the district court not view this as a loan? No. I don't believe the district court didn't view this as a loan. And was it not a loan? Essentially, you paid $25 million. To have the rights to acquire two cargoes. I'm sorry, what? To have the rights to acquire two cargoes of oil. But as you're now describing it, whether or not you actually had an opportunity to get the oil, you still had an opportunity to get the bonus, whether or not there was actually any oil. If we weren't able to take the cargo of oil. All right, so then it was contingent. But you're making faces as if it wasn't contingent. If it wasn't contingent, then you had a right to get the money, whether or not you got the oil. You could have said, I don't want the oil, I want the money. No, we didn't. No, we didn't have that right. No, you didn't. So it was contingent. It was contingent on non-delivery of the oil.  In the sense that by the passage of time, if the oil wasn't, if we weren't able to acquire the oil by a particular time, and at the point, there was no bonus in place at the time. It wasn't like this is pledged in any conventional sense. The rights to the bonus had not arisen yet. This was the prospect of some future bonus. Right. I understand. All right. So when, in fact, the participation agreement was executed, a signature bonus was required by COCL. And at the time, it applied that bonus to itself. So when you paid the $25 million, did you want to get the oil? But if you didn't get the oil, then these were other ways that you were going to? We wanted the oil. $25 million. We wanted the oil, but we're dealing with a third world country, and we wanted to make sure that we could get paid. So was it a loan? So why weren't you using commercial? Was it a loan? No. We wanted the oil. But you said you wanted to make sure you got paid. So is that a loan then, collateral? I don't see it as collateral. I see it as a previously committed right to acquire a bonus payment. What does the district court say about this? She had some explanation, and I gather it's what you're trying to say now, which is that the property was somehow yours automatically, and therefore it wasn't being used in commerce. I didn't really understand it very well. Well, there was no use in commerce as to this particular bonus. Remember, this was a bonus that arose for getting the right to explore for oil in this region between the Congo and Angola. Where was this money during the time period? This money was offshore in a bank account in Bermuda, and that was paid to a bank account, a designated account in New York, which was under the crude oil sales contract. Okay. It was a zero balance account and went right back to Bermuda the same day. But it was paid to New York at some point. It's very confusing. Is there anything else you want to discuss other than that? Well, I just wanted to say that I was prepared to, and I don't think we have time, but to go through all of the obligations we set out in our brief were obligations of two kinds. The in-kind debts were satisfied by taking oil in the case of the tax and royalty or taking in-kind in the Congo to satisfy those. There was a bunch of miscellaneous obligations like Social Security payments and payments for rental taxes on housing. Those were paid in the Congo from money in the Congo. The 14K operatorship bonus is not property of the Congo. That's property we paid to the Congo to get rights under the Act as an operator in putting together this 14K AMI joint project. All right. I think we can work that out for ourselves. So thank you very much. Your time is up. Thanks very much. Counsel, you have five minutes. First, I would just like to address for a moment the issue preclusion argument with respect to the Fifth Circuit's opinion and to point the Court to some authority that we didn't mention in our brief, which is the Restatement Second of Judgments, Section 29. And in that, in the Restatement Second of Judgments, it says that issue preclusion need not apply when it's important to develop the law. And comment I in particular is about fresh determination of law that says that an appellate court, it says where an issue was determined in an appellate court whose jurisdiction is coordinate to that of the appellate court in the second action, that issue preclusion need not apply, or even when the issue is of general interest and has not been resolved by the highest appellate court that can resolve it. And the Supreme Court in Montana referred to this at page 161 and said an unreflexive application of collateral estoppel could freeze doctrine in the areas of developing law. If the Court were to look at the, you know, reconsider the meaning of the phrase used for, you know, in your questioning of my opposing counsel, one of the things that Your Honor stated was, does it have to be the foreign sovereign that uses the debt or the intangible property for commercial activity? Well, I think the proper thing is really to look at the entire underlying activity. And if you look at the underlying activity, basically what happened here, for example, there was a joint venture in which the Congo wanted to partner with a U.S. corporation for its expertise. As part of that, it's that the Congo said to Chevron Texaco, we'll give you the right to some oil that you can take out of our ground in exchange for which if you give us royalty payments on some of this oil. Okay? And it's the Congo that created. So what is the property in the United States used for commercial activity in the United States? It is the payment obligation that the U.S. corporation has to the Congo to pay the, you know, to pay these royalties or these profit shares. Okay? And that's what the property is. And it's used for, it's used by both Chevron Texaco and the Congo as part of this entire underlying commercial activity. And that's what we should look at. The Fifth Circuit interpretation just doesn't make any sense. And it doesn't make any sense for a number of reasons. Is that, you know, basically it would make execution on intangible debts impossible because the only exception can be if a foreign sovereign has pledged the debt as collateral, but. Apparently it's not so impossible because it happened in the Fifth Circuit. But by the way, what's the status of that? What's the status of that case? The status of that case, the Congo has been held in contempt and it's gone back to the district court and there's been a lot of proceedings, you know. Is there another appeal pending? Yes, there are several appeals pending. So it's not impossible. It's difficult but not impossible. Well, it's not impossible because no other court prior to the Fifth Circuit had ever imposed this test. I understand. But in the Fifth Circuit itself it's not impossible. It's not impossible. But in the future. Another circuit? Right. Well, no other circuit has ever addressed this issue because it has seemed so self-evident that you look at the underlying. What are cases that assumed the opposite? We cite those cases, I think it's at 44 to 46 of our opening brief, Your Honor. We can find it there. We can find it there. That's fine. Yeah. I mean, Alejandre v. The Republic of Cuba, which is where it's execution on obligations of a telecommunication company here and the court just looked at the underlying activity, Libra Bank v. Banco Nacional, the Second Circuit where they. So how would you – what would you define as the standard of the test? The standard of the test is that you look at the underlying commercial activity. You look at the underlying activity that generates the, you know, the payment obligation. But if you look at that, that's in the Congo. I mean, the underlying activity here is the oil in the Congo. If we were talking of the foreign oil company where everything was taking place in the Congo, that might be true. But under the facts of this case, the procedural posture here, you're looking at Chevron, Texaco. You're looking at the fact that even with its offshore subsidiaries that virtually all of their activities, their engineering, legal, geological, financial activities take place here. That's not the question. The question is where is the property of the foreign state that's used for a commercial activity in the United States? Now, if we're moving to the surface. The property is the obligation of Chevron to pay money to the Congo. That's correct. Does it matter where the money is going to be paid? Does it matter where the agreement was made? What defines the location of that agreement? Well, I think to some extent we're moving to the other portion of whether it's property in the United States. No, it has to be used for a commercial activity in the United States. That's part of our current inquiry, as I understand it. Used for the commercial activity in the United States is the commercial activity which takes place here, which the undisputed facts, you know, at present in this record are that all of the engineering and geological financial decisions take place in the United States. I guess for Chevron and the related companies, the garnished companies. That's correct. So your test would look to the activity of the garnished companies as opposed to the foreign entity? Well, the foreign entity came here to the United States to ask those companies to, you know, to help them extract their mineral resources. So therefore, that activity takes place in the United States. Okay. What if it's a company? What if they're garnishing a company that it had not asked to come to the Congo? Would that make a difference to your factors? You mean still a U.S. company? A U.S. company, but that had not gone to the Congo. Would that make a difference? No, it wouldn't make any difference. If it's a U.S. company that has a debt and it has activities that took place in the United States with respect to it. It doesn't seem to me to make sense to be looking at where the company's activities are as opposed to where the obligation. It's not. The commercial activity in the United States has to be the transaction. Yes. Not what else the company is doing. Well, it's not what else the company is doing. It's the entire conduct of the commercial activity, which is, you know, the engineering, all the work with respect to the extraction of the oil. A lot of that takes place here. Granted, the oil is. But that's not the property. The property is the obligation. The property is the obligation. And that obligation was created as part of this activity where the Congo came to the United States, came to Chevron Texaco because of their expertise, which they knew was centered here in San Ramon, and which all the activities took place in San Ramon and essentially said, you know. Thank you very much. Cancel. You have another sentence. I'm sorry. Is my time up? Because my clock says I have a few minutes. Your time is over. Over up. Sorry. My clock here said I have a few minutes. It's over.       All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise. All rise.
judges: Berzon, Rawlinson, Callahan